# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Jeannie Merriman ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 16 CV 50073 |
| ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This is a Social Security disability appeal. In early 2010, plaintiff Jeannie Merriman began experiencing pain in her neck and back, along with migraines and pelvic pain. Over the next several years, she visited a series of doctors trying to diagnose and treat these and other symptoms, such as fatigue and generalized weakness. Eventually, she was diagnosed with fibromyalgia and then later with interstitial cystitis and endometriosis. Because of her chronic pain, she stopped working in early January 2011, when she was 28 years old, and stayed home helping take care of her four children. She applied for disability benefits in June 2012. After a hearing, the administrative law judge ("ALJ") found that, although plaintiff was properly diagnosed with these ailments and that they were causing some pain, this pain was not severe enough to prevent her from working full-time.

This is a complex case for multiple reasons. First, plaintiff's ailments are not easy to diagnose nor easy to treat in a one-size-fits-all way. Fibromyalgia, in particular, is a chronic pain condition that for many years has been the subject of debate in both the medical and legal communities, as illustrated by the differing views expressed by the majority and dissenting

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

opinions in the Seventh Circuit's most recent decision on this issue. *Kennedy v. The Lilly Extended Disability Plan*, Case No. 16-2314 (7th Cir. May 18, 2017).[2] Second, related to the first point, these cases typically hinge on the believability of the plaintiff's subjective pain allegations.[3] Third, plaintiff saw many doctors (with different specialties) over a relatively short period (*i.e.* from 2010 to 2014), and their opinions and observations differ in various ways. Fourth, at the time of the hearing, plaintiff was receiving new diagnoses and was still undergoing tests and treatments to confirm them. Fifth, the medical expert, whose admittedly difficult task was to synthesize the competing strands of evidence, offered testimony that is not easy to parse, a difficulty compounded by inaudibility gaps in the transcript. To be clear, unfortunately, these factors are not uncommon in social security disability cases, but it is still worth keeping them in mind when assessing these issues and the ALJ's analysis of them.

The hearing was held on May 28, 2014. Plaintiff testified that she last worked for Kellog's, stocking shelves and putting up displays in retail stores. She quit in January 2011 because the bending, lifting, and squatting caused too much pain. Plaintiff first complained about fibromyalgia-related pain sometime in 2010. She described this pain as follows:

> It is still in my back. It's in my neck, it just depends on the day. It's never the same each day. I've had pain in the shoulders, the elbows, the ankles, the knees, the wrists. You name it, I've had it.

---

[2] Like fibromyalgia, interstitial cystitis is a chronic pain disorder, one that seems to have a similar difficulty in diagnosis and treatment. *See* Mayo Clinic website, http://www.mayoclinic.org/diseases-conditions/interstitial-cystitis/home/ovc-20251830 ("Interstitial cystitis most often affects women and can have a long-lasting impact on quality of life. Although there's no cure, medications and other therapies may offer relief. [] Frequent urination and pain may interfere with social activities, work and other activities of daily life."); Harvard Health Publications, "Diagnosing and treating interstitial cystitis," http://www.health.harvard.edu/diseases-and-conditions/diagnosing-and-treating-interstitial-cystitis ("There's no cure for IC, but many treatments offer some relief, either singly or in combination. Figuring out what works can be hit-or-miss; there's no way to predict who will respond best to which treatment. Fortunately, increasing awareness and greater understanding of this complex disorder are helping to speed diagnosis and encourage research.") (August 2011).

[3] Regarding credibility determinations in cases in which subjective pain assertions are critical, such as cases involving fibromyalgia, for an excellent discussion, *see Geer v. Berryhill*, 15 C 1470, 2017 U.S. Dist. LEXIS 42308, *37 (E.D. Wisc. Mar. 23, 2017) (discussing the difficulty in determining credibility caused by the administrative regulations).

R. 41. The pain worsened with activity. She was currently taking Cymbalta and had tried other medications. She explained as follows:

> I started out with Savella with the first doctor that had diagnosed me, Dr. Dillard [phonetic]. We tried that for about three to four months and we kept upping the dose, and then Medicaid refused to pay the higher doses. So then I was off of it for probably about a good four to five months. And then when I had changed physicians to Dr. Mohammad [phonetic], she had set me up to see a rheumatologist, Dr. Neka [phonetic]. And then Dr. Neka had put me back on the Savella. I was on it the second time for probably about three months or so. And then I was taken off it because it was not working, and put on Cymbalta.

R. 42. Plaintiff described her pelvic pain as follows:

> The pelvic pain, for, you know, the last couple of years, [has] been two to three times a week. When it's menstrual cycle week it hurts and it feels horrible every single day of the menstrual cycle week. Lately, after my last surgery that I just had it's been hurting every day since.

R. 43. She had surgery on the 13th of the month (*i.e.* approximately two weeks before the hearing) to "look for" endometriosis. *Id.* Based on this surgery, she was diagnosed with stage one endometriosis and interstitial cystitis. For the latter condition, she had received, on the morning of the hearing, the first in a series of treatments known as bladder irrigation.

Plaintiff stated that she had a continuing problem with headaches (or sometimes referred to as migraines). They usually occurred every day of her menstrual cycle, which sometimes lasted up to two weeks. The migraines typically lasted the entire day. She tried a number of medications, including Imitrex and Topamax.

Dr. Ashok Jilhewar, the medical expert, testified next. His testimony is important because the ALJ would later give it great weight over against other conflicting opinions. Dr. Jilhewar began by stating that he could not find the medical records about the alleged endometriosis and interstitial cystitis.  However, plaintiff's attorney explained that these records had just been submitted the day of the hearing and that the endometriosis was diagnosed only the previous

3

week and that additional records would be submitted after the hearing. Dr. Jilhewar stated that this information would be "critical" to the analysis because the intensity of plaintiff's pain was not "documented." R. 50. Dr. Jilhewar then noted that there was no rheumatology evaluation in the record. But again, plaintiff's counsel provided an explanation, stating that there was a rheumatology evaluation in the record.

Dr. Jilhewar explained that interstitial cystitis was "a group of diseases similar to the irritable bowel syndrome" and often co-existed with "mild headaches" and fibromyalgia. R. 51. He emphasized that a proper diagnosis could not be made "until and unless a neurologist performs a cystectomy" and also a urinary dynamics study. R. 52. He found no "documentation" that these procedures had been done. Plaintiff's counsel noted that the documentation would be part of the post-hearing records. Plaintiff stated that she had a laparoscopy on the 13th to which Dr. Jilhewar stated that "[y]ou cannot diagnose interstitial cystitis with a laparoscopy." R 54. The ALJ then asked whether the laparoscopy could be used to diagnose endometriosis. He agreed that it could be used for this diagnosis. The ALJ stated that he would need to "see what" the post-hearing records indicated on these issues. R. 55. But the ALJ confirmed that Dr. Jilhewar's opinion, based on "the way the record stands now," was that neither the interstitial cystitis nor endometriosis were "documented." R. 56.

Dr. Jilhewar next discussed fibromyalgia. He noted that the evidence varied on whether plaintiff had the requisite number of tender points to diagnose this condition, but he ultimately agreed that there it was sufficiently "documented" based on (among other things) the findings of 18 out of 18 tender points by Dr. Saha, a consultative examiner. R. 57. However, as for treatment, Dr. Jilhewar found it significant that plaintiff had not undergone treatment of tender points, which he explained was a non-standard treatment but one that "some physicians" would

offer if the "pain is extremely serious." R. 59.[4] Plaintiff's counsel asked if Dr. Jilhewar was aware that plaintiff had received injections from Dr. Nika, a neurologist. Dr. Jilhewar responded that he "missed that." R. 67. Plaintiff's counsel then referred him to the page in the record documenting that plaintiff received four Kenalog injections, each three months apart. Dr. Jilhewar explained as follows why Kenalog injections were not appropriate for fibromyalgia:

> [A Kenalog injection] is not the same as a tender point presentation, this is a general system [INAUDIBLE]. Most of the doctors would not have given that because of the side effects injury what claimant mentioned, increasing the blood pressure. It is [INAUDBLE] device. What I was talking about, as small dose of just [INAUDIBLE] with usually one cc of the [INAUDIBLE] and one cc of the normal saline injected in a star like fashion in the tender points. And this is not—that was what I was talking about the tender points, not the general systemic steroid injections. They are only useful, not for the fibromyalgia, but for the inflammation of varieties of rheumatoid arthritis. And only the physician knows the reason for that, I don't know the answer why it was given.

R. 69. Plaintiff's then counsel asked Dr. Jilhewar whether his specialty was rheumatology. He stated that it was not, but added that, over the 30 years of his practice, he has had "thousands, not hundreds, thousands of patients with tender points." *Id.*

> As for migraines, Dr. Jilhewar testified as follows:
>
> Migraine headache. In the [INAUDIBLE], and this is number 10F, page number around 50, date 1/20/2014. As of that page number I found now is 10F, page 46. The physician is writing that for one year claimant has been reporting chronic daily headaches. And no mention of intractable nature of the headache was mentioned. I did not find any emergency room visits or hospitalization for intractable headaches. I [INAUDIBLE] medications used for fibromyalgia syndrome are also used to prevent the attacks of migraine headaches. From the claimant's testimony today, claimant has mentioned migraine. There are certain medications approved for the nature of migraine, and because of the health insurance reasons, I believe the claimant cannot be prescribed those because the Department of Public Aid does not pay for it. The cost is extremely high at $20 a tablet. Public Aid Department

---

[4] He described tender points treatment as follows: "The treatment is usually done by the rheumatologist. He stands in for the primary physician if that doesn't [INAUDBLE] and it is just an injection of the tender point either with a distal water or plain water, [INAUDIBLE] anesthetic. And most of the time is done with a combination of local anesthetic and steroids." R. 67. The Court notes that the Mayo Clinic website does not include this procedure in its list of possible fibromyalgia treatments. However, *The Merck Manual* (19th Ed.) states that injections are sometimes "used to treat incapacitating areas of focal tenderness," but states that this treatment is used "rarely" and "should not be relied on as primary treatment." *Id.* at 377.

5

> doesn't have adequate budget to provide those medications to the [INAUDIBLE] recipients. But there was not effort made by the treating provides [sic] to prescribe her medications specifically approved or [INAUDIBLE].

R. 60-61. He stated that neither the migraines nor fibromyalgia (the only two conditions he found qualified as severe impairments) equaled any listing. As for the migraines, he added the following: "I cannot find the medical record to document the intractable link of the migraine." R. 64. He explained that he was referring to neurological consultations and noted that there were no prescriptions for "large doses of steroids" or medications like Ergotamine or Sergive. R. 64-65. For these reasons he found no "intensity of pain management." *Id.* Later in the hearing, plaintiff's counsel re-visited the issue, and started to ask a question about the doctor's opinion that plaintiff had not received treatment for migraines, at which point Dr. Jilhewar interrupted and stated the following: "Oh, no, I did not say that. I said that she did not have the treatment for the *intractable* migraine." R. 70 (emphasis added). Counsel then stated that plaintiff was currently taking Butalbital for migraines. Dr. Jilhewar stated that it was "not a good medication" because it was a barbiturate and that any doctor in Illinois who prescribed this drug "frequently" can get "in trouble with the [Illinois] licensing department, just to let you know." R. 70. Counsel then noted that plaintiff had previously taken Imitrex and Topamax. Dr. Jilhewar seemed to concede that these were valid headache medications, although his answer is unclear because of transcription difficulties.[5] Counsel finally asked Dr. Jilhewar "where in the Social Security laws that the intractable nature requirement comes up." R. 71. He stated that it was used because there was no specific listing for a migraine. *Id.*

On November 10, 2014, the ALJ found that plaintiff was not disabled. The decision is 19 pages and filled with detailed summaries of discrete findings made by plaintiff's multiple

---

[5] His specific answer was as follows: "There are many [INAUDIBLE] of Imitrex and because [INAUDIBLE] I don't think I can comment on her doctors because the Imitrex is the only one [INAUDIBLE]. Again, this is just out of cost of the medication. I think I had a previous comment in my testimony about the nature of migraine." R. 71.

6

doctors. In fact, these summaries are included twice, first in the narrative fact section and then repeated, almost verbatim, in the later analysis which then adds a few analytical sentences sketching out the ALJ's rationale. The ALJ found that plaintiff had the following severe impairments: fibromyalgia, migraine headaches, endometriosis, interstitial cystitis, and asthma. In the residual functional capacity ("RFC") analysis, the ALJ found that plaintiff could do sedentary work subject to certain minor restrictions. The ALJ relied on three main rationales for discounting plaintiff's pain allegations. First, plaintiff received only conservative treatment. Second, her doctors often reported "normal" examination findings. Third, her daily activities were inconsistent with allegations of disabling pain. The ALJ's decision relies heavily on Dr. Jilhewar's testimony, which the ALJ adopted (with one minor exception) while rejecting other opinions from treating or consulting doctors. In particular, the ALJ gave "limited weight" to Dr. Saha's conclusion that plaintiff was "unable to perform her regular work" because he relied on plaintiff's "subjective complaints." R. 28.

## DISCUSSION

Plaintiff raises two main arguments for remand. First, she argues that the ALJ failed to consider the *combined* effect of her ailments. This argument includes several sub-arguments, such as cherry-picking and doctor-playing. Second, plaintiff argues that the records documenting her endometriosis and interstitial cystitis were not available at the time of the hearing and that, as a result, neither Dr. Jilhewar nor any other expert considered them. In a sense, the second argument is a component of the first. The Court begins with the second argument because it is the narrower of the two and because it provides a clear basis for a remand.

7

## I. Interstitial Cystitis and Endometriosis.

Plaintiff alleges that she experienced pain from multiple causes. Fibromyalgia caused pain in her back, neck, knees, elbows, wrists, and ankles. Too much walking caused swelling in her lower legs, which then needed to be elevated twice a day. Day-long migraines occurred during her menstrual cycle. She also had chronic pelvic pain. In May 2014, the same month as the hearing, plaintiff began seeing Dr. Toussaint, a gynecologist, to address the latter issue. Dr. Toussaint diagnosed plaintiff with endometriosis and interstitial cystitis.

As noted above, Dr. Jilhewar expressed doubt about whether plaintiff had these two conditions. He stated that there was no cystectomy, a test he viewed as being necessary to diagnose interstitial cystitis. Given this skepticism, he found that these conditions were not severe impairments. His opinion about plaintiff being able to work full-time, therefore, was based on the assumption that she *did not* have these conditions. However, neither Dr. Jilhewar, nor the State agency physicians, ever reviewed the records from Dr. Toussaint that were submitted after the hearing. *See* Ex. 14F.

However, in his opinion, the ALJ concluded that plaintiff's endometriosis and interstitial cystitis qualified as severe impairments at Step Two. The ALJ provided no explanation for why he reached this conclusion, but he presumably overcame the doubts expressed by Dr. Jilhewar based upon the medical records provided after the hearing. Later in the opinion, the ALJ summarized the post-hearing records, noting that Dr. Toussaint had diagnosed plaintiff with both conditions. Based on these records, the ALJ concluded that plaintiff's "symptoms" were "genuine." However, the ALJ further concluded that "surgical procedures" were "generally successful in relieving [these] symptoms." R. 26. Given that pelvic pain was the main symptom, the ALJ presumably concluded that this pain had been eliminated.

The problem with this conclusion is that it is not supported by any plausible evidence. The ALJ noted that Dr. Toussaint performed a laparoscopy in May (presumably one of the surgical procedures that were allegedly successful) and further noted that Dr. Toussaint saw plaintiff a week after the surgery. This follow-up visit is the key piece of evidence relied on by the ALJ for the conclusion that plaintiff's pelvic pain had essentially been cured. Here is the ALJ's explanation:

> During her one-week post-operative follow up visit on May 21, 2014, the claimant denied fever and bleeding. On exam of the abdomen, Dr. Toussaint noted that her incision was healing well. Exam of the pelvis showed no bleeding. Extremities showed no edema or pain. Dr. Toussaint diagnosed her with status post laparoscopy, interstitial cystitis, stable. The doctor noted that her pathology showed endometriosis. On May 29 and June 4, 2014, the claimant underwent bladder irrigation without any reported complications (Exhibit 14F).

R. 27. This explanation is hard to follow and raises a number of questions. Did the ALJ truly believe that that the healing of surgical incision wound one week after surgery demonstrated that plaintiff's pelvic pain was no longer a problem? Why did Dr. Toussaint continue to list the diagnosis as interstitial cystitis? Why was absence of swelling in the extremities relevant to pelvic pain? Although the ALJ interpreted these findings to mean that plaintiff's pelvic pain was cured, there is no sense that *Dr. Toussaint believed* this to be the case. Nor did any other doctor offer such an opinion. Lacking any supporting medical opinion, the ALJ engaged in impermissible doctor-playing, which is a basis for remand. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (the ALJ should "rely on expert opinions instead of determining the significance of particular medical findings themselves"); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Plaintiff argues that the ALJ should have submitted the post-

9

hearing records to Dr. Jilhewar and sought an updated opinion. This Court agrees, especially given that Dr. Jilhewar himself identified these records as being "critical" to the analysis.

## II. Combined Effects.

Plaintiff's second major argument is more widespread. Based on the first argument, plaintiff's claim that the ALJ failed to consider the cumulative impact of her impairments has already been proven to a certain extent. But plaintiff raises additional arguments that directly or indirectly support this larger thesis. The best way to address them is to consider each of the ALJ's three rationales.

### A. Normal Examinations.

Throughout the opinion, the ALJ repeatedly referred to plaintiff as having "essentially normal" examinations. *See* R. 15 ("It is noteworthy that Dr. Muhammad, the claimant's primary care doctor, has reported essentially normal mental status examination during numerous office visits[.]"); R. 26 ("Physical examination during this visit was essentially normal."); R. 27 ("Exhibits 3F, 4F, 6F, 7F, 11F, 13F and 14F show essentially normal exams."). But in reviewing the records, the Court notes that the doctors themselves did not characterize these examinations with such a global assessment, and most of the reports include a mixture of normal and non-normal findings. For example, Dr. Saha stated the following: "Besides fatigue and generalized joint pain and muscle pain, the patient is able to move around but her movement is restricted because of pain all over the body and joints." R. 331. The ALJ listed Exhibit 3F, which this statement is drawn from, as one of the exhibits showing essentially normal findings.[6] Moreover, many of the normal findings cited by the ALJ relate to body systems seemingly remote from the

---

[6] Although the ALJ in some instances acknowledged the non-normal evidence, he did not give it any real weight. Consider the following tail-wagging-the-dog sentence: "On November 12, 2012, Dr. Muhammad reported *normal* physical examination, *except for* decreased range of motion, tenderness, pain and spasm in both shoulders and hips." R. 19 (emphasis added).

10

ailment under consideration. In short, by flattening these disparate findings into a univocal conclusion—"essentially normal"—the ALJ downplayed the evidence favorable to plaintiff and did so by conducting a layperson analysis of the underlying findings made by the doctors.

In addition to these concerns, there is a larger concern that the ALJ was improperly requiring plaintiff to "prove" her pain allegations with objective evidence. As the Seventh Circuit has emphasized, Social Security Regulation 96-7p(4) provides that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) ("an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain"); *Adaire v. Colvin*, 778 F.3d 685, (7th Cir. 2015) ("[The ALJ's] principal error, which alone would compel reversal, was the recurrent error made by the Social Security Administration's administrative law judges, and noted in many of our cases, of discounting pain testimony that can't be attributed to 'objective' injuries or illnesses—the kind of injuries and illnesses revealed by x-rays."). This issue is especially relevant to conditions like fibromyalgia. *See Harbin v. Colvin*, 2014 WL 4976614, *5 (N.D. Ill. Oct. 6, 2014) ("Fibromyalgia is diagnosed primarily based on a patient's subjective complaints and the absence of other causes for the complaints.").

  **B.**  **Conservative Treatment.**

The ALJ's second major rationale—and perhaps the central one—is the assertion that plaintiff only received conservative treatment and that, in certain instances, these treatments had "controlled" or even eliminated plaintiff's problems. *See* R. 25 ("The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual."). The

ALJ stated that plaintiff's fibromyalgia was "stable" and "well managed" through medications and noted that her doctors never prescribed any "stronger narcotics." The ALJ relied on Dr. Jilhewar's conclusion that "the record shows no intensity of management of pain for fibromyalgia." R. 24.[7] The ALJ noted that plaintiff never went to the emergency room for her migraines and received only routine medications and not ones that would be given for "intractable" headaches. The Court finds that the ALJ failed to give full consideration to all the lines of evidence and relied, in part, on layperson analysis.

The ALJ gave short shrift to the various treatments and medications—some more successful than others—that plaintiff tried over this four year period. Although the ALJ mentioned some of them in the narrative portion of the opinion, the ALJ did not give them any weight in the ensuing analysis nor explain *why* they should be summarily disregarded. Plaintiff took numerous medications for pain and other symptoms, including (among others) Savella, Amitriptyline, Lyrica, Tramadol, Celexa, Cymbalta, and Gabapentin. These were not over-the-counter medications, and there is no evidence that doctors viewed them as conservative treatments. With regard to fibromyalgia, the ALJ observed that plaintiff failed to take "stronger narcotics," but this leaves unanswered whether there were any such medications. There was no medical testimony that "stronger narcotics" existed to treat the impairment. The ALJ seems to assume there were, but does not specify what these medications were.[8] Plaintiff also tried physical therapy; received Kenalog injections; and underwent surgeries. Although the ALJ considered all these treatments as conservative, Dr. Jilhewar at times took an opposite tack. He described the Kenalog injections and Butalbital as risky treatments, but did not explore the

---

[7] As noted above, this conclusion rested on plaintiff's failure to receive tender points treatment.
[8] The ALJ noted that Dr. I. Singh stated that plaintiff's fibromyalgia had been treated "with the appropriate agents and that he did not have anything more to offer her." R. 26. But this statement is ambiguous and could equally support plaintiff's theory of the case—*i.e.* it that there were no other stronger options.

12

possibility that this very fact supported plaintiff's claim by showing that her problems were serious and had not been easily or successfully treated with other more conservative treatments.[9]

There is an additional concern about the ALJ's conservative-treatment rationale. The medications plaintiff took for her ailments were dictated at times by her financial situation. *See, e.g.* R. 18 ("On April 20, 2012, she was prescribed amitriptyline, as Public Aid did not cover Savella"). Although the ALJ noted these facts, the ALJ again gave them no weight. However, the ALJ should have given consideration to this possible explanation before concluding that plaintiff's treatments were conservative. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014).

### C. Daily Activities.

The ALJ's third major rationale was that plaintiff engaged in a "wide variety" of activities and lived a "robust" lifestyle, demonstrating that she could "do all the basic demands of competitive work" and that her claims of disabling pain were exaggerated and not credible. R. 20, 27 ("all the things the claimant does for herself and her kids" is consistent with being able to work a sedentary job). The ALJ referred to specific activities engaged in by plaintiff (*e.g.* reading, crocheting, driving, paying bills, and preparing simple meals) and also emphasized that she "takes care of 4 children." R. 27. Plaintiff complains that this portrayal failed to consider contrary evidence and failed to heed the Seventh Circuit's warnings about placing too much weight on this type of evidence. This Court agrees.

As for contrary evidence, it existed in at least three places. First, in plaintiff's daily function report, she described various limitations. She made the following general statement: "I can't stand or sit for very long without being in pain. I also can't do simple house chores without

---

[9] *See generally,* https://en.wikipedia.org/wiki/Butalbital ("Butalbital is not suggested as a first-line treatment for headache[s] because it impairs alertness, brings risk of dependence and addiction, and increases the risk that episodic headaches will become chronic. When *other treatments fail* or are unavailable, butalbital may be appropriate for treating headache[s] if the patient can be monitored to prevent the development of chronic headaches.") (emphasis added).

13

being in a lot of pain." R. 240. She described limitations related to specific chores. *See* R. 241 ("Depending on how much pain I am when I wake up, I clean some of the house. Then I lay down for a while. Then I get up and make food and clean a little bit more and then I lay down some more. Then I get up and finish what needs to be [done] in the house and then go to bed."); R. 242 ("I can't cook several course meals anymore because I can't stand that long without hurting really bad."); R. 242 ("Laundry takes all day. I do laundry 2 times a week."); R. 242 ("My kids do a lot of chores in the house."). These explanations muddy the unqualified picture given by the ALJ.

Second, the ALJ relied on a function report completed by plaintiff's boyfriend, describing it as follows:

> [A]t Exhibit 8E, Brad Reiners, the claimant's fiancé, stated that the claimant takes 2 of their kids to the bus stop and another to school. She then comes home and reads. Later, the claimant picks up their son and watches him until Brad arrives. Then, the claimant helps the kids with homework. Brad also stated that the claimant lets the dog outside, has no problem with personal care, prepares her own meals (i.e., TV dinners, quick prepared food, and peanut butter and jelly sandwiches), does some laundry, drives daily, can go out alone, goes shopping in stores, pays bills, handles a savings account and uses a checkbook. Brad added that the claimant enjoys reading and crocheting, plays cards with her neighbor, and talks on the phone daily.

R. 27. This is a portrait of a non-disabled person. But, critically, this picture omitted key components from the same report that supported plaintiff. For example, Mr. Reiners made the following general statement at the beginning of this report: "She cannot clean, stand for more than 5 minutes without hurting all over. Sitting for long periods of time also causes[s] her pain all over." R. 271. As for childcare, Mr. Reiners stated that he and their 13-year-old daughter helped with these activities. R. 272. As for laundry, he stated that plaintiff can only do "part" of it and that it was an "all day event." R. 273. As for the hobbies, he stated that plaintiff could not

14

finish reading a book anymore and could do "only a little" crochet at a time because of the pain from sitting. R. 275. On remand, the ALJ should address these contrary facts.

Third, the ALJ relied on a report from Dr. Montes that contains a few statements about plaintiff's daily activities. The ALJ suggested that *Dr. Montes had concluded* that plaintiff led a "robust" lifestyle. *See* R. 20 ("[Dr. Montes] reiterates a robust life-style for Jeannie"). But this is a manufactured conclusion. To start with, Dr. Montes never used the word "robust," nor anything similar. The statements in his report about daily activities were few and not especially relevant to his diagnosis. So it is doubtful whether he would agree with this characterization. And the ALJ again downplayed contrary evidence. In particular, Dr. Montes stated as follows: "[Plaintiff] just gets upset with herself because her energy is lower. Her ability to move around is not as good as she would want to be at 30 years old. *She cannot play with her children and that upsets her.*" R. 343 (emphasis added). The ALJ at least did not ignore the statement, but nonetheless gave it no weight based on the following rationale: "Dr. Montes [] contradicts himself when he says that she is upset because she cannot play with her children after noting the pleasure this activity brings her." R. 20. It is not clear why this is contradictory. Put differently, Dr. Montes's statement is more properly interpreted to mean that plaintiff *previously* enjoyed playing with her children when she was healthier, but was no longer able to do so or, perhaps, was not able to do so as frequently or capably since her condition had worsened.

In addition to cherry-picked evidence, there is a further concern that the ALJ failed acknowledge the Seventh Circuit's warnings about over-relying on claimant's daily activities, especially taking care of children. The Seventh Circuit has stated that ALJs should be careful about placing too much weight on a claimant's ability to care for her children. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (the ALJ failed to acknowledge that the claimant

15

"*must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts") (emphasis in original). Unlike with work activities, a claimant often can perform household activities under a more flexible standard and then these activities are typically judged by a lower standard of performance. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (the "failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."); *Hamilton v. Colvin*, 525 Fed. Appx. 433, 438 (7th Cir. 2013) ("We have admonished ALJs to appreciate that, unlike full-time work, the 'activities of daily living' can be flexibly scheduled"). On remand, the ALJ should consider all the relevant evidence in a more balanced way.

\*   \*   \*

To return to the original framing of plaintiff's second argument—whether the ALJ considered the impairments in their totality—the Court notes that it is not always easy to answer this question especially because ALJs typically include boilerplate language indicating that such an inquiry has been made. But in this case, in addition to the evidence already summarized, there is also indirect evidence from Dr. Jilhewar's testimony. He employed a divide-and-conquer strategy in which he rejected, one-by-one, each of plaintiff's ailments and ignored any evidence not strictly related to the particular ailment under consideration. For example, in discussing plaintiff's fibromyalgia, he excluded evidence that plaintiff received Kenalog injections by stating that this was not a proper treatment *for fibromyalgia.* But he failed to later consider the possibility that these injections may have been an attempt to address the broader problem of pain arising from multiple conditions. A related problem is that Dr. Jilhewar evaluated each allegation under a high standard of proof, one that often became a moving target. Consider, as one example,

16

the testimony about headaches. Reminiscent of the no-true-Scotsman fallacy,[10] each time plaintiff's counsel confronted Dr. Jilhewar with evidence supporting the claim that plaintiff's headaches were a serious problem, he would retreat and clarify that, although plaintiff may have had headaches, they were not *intractable* headaches. The net result is that both Dr. Jilhewar and the ALJ *entirely* disregarded plaintiff's headaches (and most of her other allegations of pain) and did not consider them at all in the RFC formulation. On remand, the ALJ should make specific findings about the frequency and severity of each ailment or symptom and should state specifically whether any limitation has been included in the RFC to account for them.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: May 30, 2017          By: _____
                                Iain D. Johnston
                                United States Magistrate Judge

---

[10] *See* https://en.wikipedia.org/wiki/No_true_Scotsman. As an aside, from an early age, the undersigned learned from his grandparents that there were many things that no true Scotsman would do, such as supporting the Three Lions.